STATE OF CONNECTICUT *v.* NEW ENGLAND
HEALTH CARE EMPLOYEES UNION,
DISTRICT 1199, AFL-CIO
(SC 16869)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued April 16—officially released September 16, 2003

*Michael E. Passero*, for the appellant (defendant).

*Thomas P. Clifford III*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (state).

*Opinion*

NORCOTT, J. The issue raised in this appeal is whether the trial court properly granted an application to vacate an arbitration award sustaining a grievance

by clinical staff members at the Connecticut Juvenile Training School (school). The defendant, New England Health Care Employees Union, District 1199, AFL-CIO, appeals[1] from the judgment of the trial court denying its application to confirm the arbitration award and granting the application of the plaintiff, the state of Connecticut, to vacate the award. On appeal, the defendant contends that the trial court improperly granted the application to vacate the award because: (1) the trial court was required to limit its review of the arbitration award to a determination of whether the award conformed to the submission; (2) the trial court substituted its own judgment for the judgment of the arbitrator; (3) pursuant to General Statutes § 52-418 (a) (4),[2] the

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 52-418 provides: "(a) Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

"(b) If an award is vacated and the time within which the award is required to be rendered has not expired, the court or judge may direct a rehearing by the arbitrators. Notwithstanding the time within which the award is required to be rendered, if an award issued pursuant to a grievance taken under a collective bargaining agreement is vacated the court or judge shall direct a rehearing unless either party affirmatively pleads and the court or judge determines that there is no issue in dispute.

"(c) Any party filing an application pursuant to subsection (a) of this section concerning an arbitration award issued by the State Board of Mediation and Arbitration shall notify said board and the Attorney General, in writing, of such filing within five days of the date of filing."

trial court had no authority to review evidence and find facts; and (4) the trial court improperly relied upon a prior arbitration award when vacating the arbitration award at issue in the present case. The plaintiff disputes these claims, and provides two alternate grounds for affirming the trial court's judgment: (1) the arbitrator exceeded her authority by extending the remedies to employees who voluntarily had left their jobs at the school; and (2) the arbitrator's award violated public policy. We agree with the defendant that the trial court improperly exceeded its review of whether the arbitration award conformed to the submission. Further, we reject the plaintiff's alternate grounds for affirming the trial court. Accordingly, we reverse the judgment of the trial court.[3]

The following undisputed facts are relevant to our resolution of the issues in this appeal. The arbitration in the present case arose out of a collective bargaining agreement (agreement) between the parties that covers the period from July 1, 2001 to June 30, 2005. The agreement contained provisions with respect to, among other things, hours of work, work schedules and overtime. The agreement also provided that the defendant had a right to submit disputes that arose over scheduling to arbitration. If a scheduling dispute was submitted to arbitration, the agreement required the arbitrator to "give weight to the following factors in the following order of priority: the impact on patient/client care and service to their families, the impact on the [department of children and families (department)], and the impact on the employees."

In 2001, despite lengthy negotiations on the need for a second shift for the clinical staff at the school, the parties were unable to reach a mutually agreed-upon

---

[3] Because of our determination of the defendant's first claim, we need not reach the defendant's other claims on appeal.

schedule. Therefore, on November 2, 2001, the plaintiff, through the department, unilaterally instituted a new second shift.[4] The defendant timely submitted a grievance for arbitration, claiming that the second shift, as instituted, violated article two[5] and/or article thirteen, § 6,[6] of the agreement.[7] On January 29, 2002, after several days of hearings, the arbitrator sustained the defendant's grievance. Specifically, the arbitrator determined that the second shift, as instituted by the department, violated article thirteen, § 6, of the agreement.[8]

[4] Prior to this second shift being instituted, all clinical staff had worked a regular shift from 8:30 a.m. to 4:30 p.m., and were on emergency call on a rotating basis on nights and weekends.

[5] Article two, § 2, of the agreement provides: "Neither party shall discriminate against an employee on the basis of membership or nonmembership or lawful activity on behalf of the [defendant]."

[6] Article thirteen, § 6 (A), of the agreement provides: "In the event the Employer wishes to change a facility work schedule or establish a schedule which involves work in two different shifts in new or existing facilities during the life of this Agreement, three (3) weeks written notice shall be given to the affected employee(s), the delegate, and the [defendant]. The Employer shall meet and negotiate with the [defendant] if the [defendant] objects to the proposed schedule. If agreement cannot be reached within three (3) weeks of notification to the [defendant], the Employer shall make the changes it deems advisable. The [defendant] shall have the right to request arbitration following the schedule change implementations. The arbitrator in rendering a decision must give weight to the following factors in the following order of priority: the impact on patient/client care and service to their families, the impact on the [department], and the impact on the employees. The arbitrator shall not be empowered to direct the Employer to hire additional staff or require additional overtime compensation provided the Employer has not reduced the number of employees and thus reduced the employee/patient ratio prior to this change in schedule.

"The provisions of this subsection expire automatically on the expiration date of this Agreement unless the parties mutually agree to incorporate them in a successor agreement."

[7] The specific issue submitted by the parties to the arbitrator was: "[W]hether the schedule change implemented by the [department] violated [a]rticle [thirteen], [§] 6 and/or [a]rticle [two] of the collective bargaining agreement and if so, what shall be the remedy, consistent with the agreement."

[8] The arbitrator issued the following award: "The undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having considered the evidence

Thereafter, the plaintiff filed an application in the trial court to vacate the arbitration award pursuant to § 52-418.[9] The defendant subsequently filed a cross application to confirm the award pursuant to General Statutes § 52-417.[10] On June 19, 2002, the trial court granted the plaintiff's application to vacate the award, and denied the defendant's application to confirm the award. The trial court further found that "[the arbitra-

and arguments of the parties, awards as follows:

"(1) The [department] violated [a]rticle [thirteen], [§] 6 (A) of the contract by implementing the second shift as constituted on November 2, 2001.

"(2) This [a]ward shall not take effect until March 1, 2002.

"(3) The second shift shall stay in effect as presently constituted until March 1, 2002, or until [the] parties reach agreement otherwise, whichever comes first.

"(4) On March 1, 2002, if no agreement has been reached nor new negotiations completed on any substitute schedule adjusted to meet the current needs of the clients, families, [department] and employees, the schedule existing prior to November 2, 2001 shall be reinstated and those employees who have left because of the schedule at issue here given an opportunity to return to their previous positions, if available, if no reason precluding reinstatement exists.

"Grievance sustained."

Because the arbitrator found that the schedule violated article thirteen, § 6 (A), of the agreement, it was "unnecessary to address the [defendant's] argument about any discriminatory intent underlying the schedule change." Therefore, we need not address whether the institution of the second shift violated article two of the agreement.

[9] The plaintiff set forth four grounds on which to vacate the arbitrator's award: (1) the award did not draw its essence from the agreement; (2) the arbitrator exceeded her powers in violation of article five of the agreement, § 52-418 (a) (4), and the common law; (3) the arbitrator had no authority to order the reinstatement of former employees who voluntarily had left their positions as a result of the new second shift; and (4) the award violated public policy.

[10] General Statutes § 52-417 provides: "At any time within one year after an award has been rendered and the parties to the arbitration notified thereof, any party to the arbitration may make application to the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, to any judge thereof, for an order confirming the award. The court or judge shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in sections 52-418 and 52-419."

tor] has violated § 52-418 (a) (4) by pointedly ignoring the language of article thirteen, § 6, which on its face leaves no question that she was to consider the needs of the client first, then the [department's] interests second, and finally the employees interests third." This appeal followed.

I

The defendant first claims that the trial court improperly exceeded its standard of review of the arbitrator's award when granting the plaintiff's application to vacate the award. Specifically, the defendant claims that the trial court was limited to a determination of whether the award conformed to the parties' unrestricted submission. The plaintiff claims that the trial court properly granted the application to vacate the award because the arbitrator violated the terms of article thirteen, § 6. We agree with the defendant.

Our analysis is guided by the well established standard of review of arbitration awards. "Judicial review of arbitral decisions is narrowly confined." *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, 248 Conn. 108, 114, 728 A.2d 1063 (1999). "When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution." (Citations omitted.) *Garrity* v. *McCaskey*, 223 Conn. 1, 4, 612 A.2d 742 (1992).

"Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved." (Internal quotation marks omitted.) *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 340–41, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985); see *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, supra, 248 Conn. 116 ("it is the arbitrator's judgment that was bargained for and contracted for by the parties, and we do not substitute our own judgment merely because our interpretation of the agreement or contract at issue might differ from that of the arbitrator").

In the present case, the dispute between the parties was submitted to arbitration pursuant to the terms of their agreement. At oral argument before this court, both parties acknowledged that the submission was unrestricted. Therefore, we conclude that the award in this case arose out of an unrestricted submission.

Because the submission was unrestricted, the trial court's review of the award was limited to a determination of whether the award conforms to the submission. *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, 257 Conn. 80, 86, 777 A.2d 169 (2001). "An award conforming to an unrestricted submission should generally be confirmed by the court." *Garrity* v. *McCaskey*, supra, 223 Conn. 12. The parties' unrestricted submission in the present case required the arbitrator to determine if the new second shift schedule violated article two and/or article thirteen, § 6, of the agreement, and, if so, to determine the appropriate remedy. Ultimately, the arbitrator determined that the schedule implemented by "[the department] violated [a]rticle [thirteen], § 6 (A)

of the contract . . . ." By way of remedy, the arbitrator then provided that "[o]n March 1, 2002, if no agreement has been reached nor new negotiations completed on any substitute schedule adjusted to meet the current needs of the clients, families, [department] and employees, the schedule existing prior to November 2, 2001 shall be reinstated . . . ."[11] On the basis of the plain language of both the submission and the award, we conclude that the award clearly conformed to the parties' unrestricted submission, and that the trial court improperly granted the plaintiff's application to vacate the award.

The plaintiff claims, however, that the trial court correctly concluded that the arbitrator had misinterpreted the provisions of article thirteen, § 6, of the agreement, and therefore properly granted the application to vacate the award. We disagree.

As previously stated, article thirteen, § 6, of the agreement required that an arbitrator, when rendering a decision, "give weight to the following factors in the following order of priority: the impact on patient/client care and service to their families, the impact on the [department], and the impact on the employees." The arbitrator interpreted that language as requiring a "balanc[ing] of the various factors, given their appropriate weight."[12] Conversely, the trial court interpreted this

---

[11] The arbitrator also awarded employees who had left their employment at the school because of the schedule implemented by the department the "opportunity to return to their previous positions, if available, if no reason precluding reinstatement exists."

[12] The arbitrator further explained: "The contract does not give clear guidance to the arbitrator as to the standard to be used in determining the appropriateness of the schedule under the contract, other than to say that the three factors must be taken into account and given weight in the priority noted—first patient/client care and service to families, then impact on the [department], and finally impact on the employees. I conclude that my charge is to determine whether, given those factors, considered in their proportional weight, the schedule is a reasonable one."

section as "us[ing] the language of priority . . . ." More specifically, the trial court determined that if the arbitrator found that the new schedule had a positive impact on the first two factors, and a negative impact on the third factor, then the language of article thirteen, § 6, of the agreement required the arbitrator to find in favor of the plaintiff.[13] The trial court's interpretation is one that the arbitrator considered, and ultimately rejected, when making her award: "It is not enough to conclude that if the impact on the clients and the [department] is largely positive and the impact on the employees is largely negative, the positives win. For me to conclude that the [department] would prevail merely by demonstrating that the schedule change is in its best interests and those of the clients and families would render superfluous the contractual requirement to weigh all three factors, including the impact on employees."

The parties' unrestricted submission required that the arbitrator determine whether the schedule violated article thirteen, § 6, of the agreement. Before making that determination, it was incumbent upon the arbitrator to interpret the relevant language. Although the plaintiff and the trial court may disagree with the arbitrator's ultimate interpretation of that section, as we have stated, "it is the arbitrator's judgment that was bargained for . . . and we do not substitute our own judgment merely because our interpretation of the agreement or contract at issue might differ from that of the arbitrator." *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, supra, 248 Conn. 116. "Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal

---

[13] The trial court explained that the arbitrator's "concern should have been whether the schedule change implemented by the [department] violated article thirteen, § 6 [of the agreement]. Once she had determined that the [department] had presented persuasive evidence that a clinical presence on the second shift was very important to patient care and to [department] objectives, she should have denied the grievance."

questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous." (Internal quotation marks omitted.) *Caldor, Inc.* v. *Thornton*, supra, 191 Conn. 340. Accordingly, we conclude that the trial court improperly substituted its own interpretation of article thirteen, § 6, of the agreement, for that of the arbitrator.

The plaintiff next claims that the interpretation of article thirteen, § 6, of the agreement, in a prior arbitration award, which the trial court cited approvingly in its memorandum of decision, demonstrates that the arbitrator in the present case improperly interpreted that section.[14] This claim is without merit because "in the absence of a specific contract provision to the contrary, an arbitrator is not bound to follow prior arbitration decisions, even in cases in which the grievances at issue involve the same parties and interpretation of the same contract provisions." *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, supra, 248 Conn. 125.[15]

---

[14] On January 15, 2000, another arbitrator issued a prior decision on the issue of whether "the administration at the Veteran's Hospital violate[d] [a]rticle [thirteen, [§] 6 when changing the schedules for the grievants." The parties were the same as in the present case, although the union members in the prior decision were all full-time physicians. The text of article thirteen, § 6, of the agreement, was identical in both cases.

In the prior decision, the arbitrator determined: "[T]he [a]greement is clear in prioritizing the three factors. If a change has a positive impact on patient care and on the agency or department, and a negative impact on employees, it must be upheld."

[15] The plaintiff also claims that "[the defendant's] failure to change the relevant language [of article thirteen, § 6, of the agreement] in the face of the [prior arbitration award] constitutes an implicit contractual waiver." In essence, the plaintiff is claiming that because the successor contract became effective after the prior arbitration award was issued, its interpretation of article thirteen, § 6, was incorporated into the successor contract. We rejected a similar argument in *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, supra, 248 Conn. 128–31, and we find it controlling of the present claim. In *Stratford*, we held that "an arbitrator's decision does not become a binding part of the parties' agreement unless the parties have included a provision in their agreement mandating such a result. We reiterate that even when the parties have included such a provision in the

## II

The plaintiff claims, as alternate grounds for affirming the judgment of the trial court, that its application to vacate the award properly was granted because: (1) the arbitrator's award was contrary to public policy; and (2) the arbitrator exceeded her powers in violation of § 52-418 (a). We disagree.

### A

The plaintiff first claims that its application to vacate the arbitrator's award properly was granted because the award violated a clear public policy. Specifically, the plaintiff contends that the arbitrator's award violated "a clear public policy to clinically evaluate and assist residents at [the school]." Conversely, the defendant contends that no public policy was violated by the arbitrator's award. We agree with the defendant.

We begin by setting forth the law that guides our analysis of the plaintiff's public policy claim. Despite the general rule that challenges to an arbitrator's authority are limited to a comparison of the award to the submission, an additional challenge exists when the award rendered is claimed to be in contravention of clear public policy. *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 474, 747 A.2d 480 (2000); *Garrity* v. *McCaskey*, supra, 223 Conn. 6. "[W]hen a challenge to a voluntary arbitration award rendered

agreement, however, the interpretation of such a provision is itself a proper subject of arbitration." Id., 131. That is no less true in the present case, as we see no principled distinction between the collateral effect owed to a prior arbitration award under the same agreement, and the collateral effect owed to a prior arbitration award under a previous version of the agreement. In either case, the party wishing to make a prior arbitrator's interpretation a binding part of the contract must seek to include language mandating such a result. The plaintiff did not include such language in the successor contract and, therefore, the arbitrator did not exceed her powers when deciding that the prior arbitration award was not binding on her interpretation of article thirteen, § 6, of the agreement, in the present case.

pursuant to an unrestricted submission raises a legitimate and colorable claim of violation of public policy, the question of whether the award violates public policy requires de novo judicial review. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 429, 747 A.2d 1017 (2000)." *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 45, 757 A.2d 501 (2000). Accordingly, we undertake de novo review of whether the award in the present case violated public policy.

"The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy. . . . A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . . Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . . The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail in the present case only if it demonstrates that the [arbitrator's] award clearly violates an established public policy mandate." (Citations omitted; internal

quotation marks omitted.) Id., 45–46. The public policy exception "must not be interpreted so broadly as to swallow the rule." *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, 255 Conn. 800, 816, 770 A.2d 14 (2001).

Even if a party identifies a well defined and dominant public policy, an arbitrator's award will not automatically violate that public policy. For example, in *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 416, we concluded that the arbitrator's award did not violate the public policy asserted by the plaintiff. *Schoonmaker* involved a dispute over a law firm's decision not to pay certain postemployment benefits to an attorney, who had left the firm after thirty-five years of practice.[16] Id., 421–22. The dispute was submitted to arbitration pursuant to the agreement between the parties. The arbitrator ultimately determined that the plaintiff had forfeited his right to the postemployment benefits by practicing law within three years of his retirement from the firm in violation of the retirement plan's noncompetition provision. Id., 422. Subsequently, the trial court, giving " 'great deference' to the arbitrator's findings of fact and legal conclusions," rejected the plaintiff's public policy challenge to the arbitrator's award, and granted the defendants' application to confirm the award. Id., 424.

On appeal, the plaintiff in *Schoonmaker* claimed, among other things, that the arbitrator's award violated "the strong public policy underlying rule 5.6 [of the

---

[16] The receipt of the retirement benefits was conditioned on the plaintiff's compliance with the retirement plan's noncompetition provision. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 420. The defendants contended that the plaintiff, despite his alleged retirement from the firm, was continuing to engage in the practice of law, and therefore forfeited his right to the retirement benefits he had accumulated. Id.

Rules of Professional Conduct][17] in favor of clients' unfettered access to counsel of their choice . . . ." Id., 425. We concluded that, "[a]lthough we agree with the plaintiff that rule 5.6 embodies, in part, a public policy favoring clients' access to an attorney of their choice, we reject the argument that application of a forfeiture provision violates that policy when applied to postemployment benefits that are not conditioned on the absolute cessation of practice."[18] Id., 437–38. We find the reasoning of *Schoonmaker* persuasive in the present case.

The plaintiff in this case first claims that the arbitrator's award "implicates a clear public policy to clinically evaluate and assist residents at [the school]."[19] Subse-

[17] Rule 5.6 of the Rules of Professional Conduct provides: "A lawyer shall not participate in offering or making:

"(1) A partnership or employment agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or

"(2) An agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties."

[18] In arriving at this conclusion, we considered, among other factors, that: (1) the public policy exception is "exceedingly narrow"; (2) acceptance of the plaintiff's claim would have led to an "illogical" result; (3) the plaintiff could not point to any statute or rule of conduct to support his claim; and (4) acceptance of the plaintiff's construction of the rule would have "perverse effects" in the future. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 438–40, 448–49.

[19] In support of its assertion that there is "a clear public policy to clinically evaluate and assist residents at [the school]," the plaintiff refers to No. 99-26 of the 1999 Public Acts (P.A. 99-26), entitled, "An Act Concerning the Connecticut Juvenile Training School." A majority of the changes made by P.A. 99-26, however, focus solely on the actual physical creation and operation of the school. See P.A. 99-26, § 1 (addressing proceeds from bonds); P.A. 99-26, § 3 (addressing contract negotiations); P.A. 99-26, § 4 (exempting school from low bid requirements). The only substantive measure cited by the plaintiff is P.A. 99-26, § 17, which the plaintiff asserts as charging the department with developing a " 'comprehensive approach to juvenile rehabilitation.' " The language quoted by the plaintiff, however, was amending General Statutes § 17a-3, which outlines the basic powers and responsibilities of the department. Furthermore, that language was contained in subsection (n) of P.A. 99-26, § 17, directing the department to develop a plan "which . . . shall include provisions for development of a comprehensive approach

quently, however, the plaintiff expands the scope of its public policy challenge and claims that the arbitrator's decision " 'conflicts with the clear public policy of protecting the children of our state.' "[20] Therefore, we interpret the plaintiff's public policy argument as asserting that improving the clinical offerings at the school was a necessary and vital component of the overall public policy objectives of the department. See *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 799, 758 A.2d 387 ("conclud[ing] that the protection of children, with specific reference to the department, is a clear public policy of this state"), cert. denied, 255 Conn. 905, 762 A.2d 910 (2000).

While we agree with the plaintiff that there is a public policy implicated in the present case,[21] we conclude

to juvenile rehabilitation" at the school. While clinically assisting and evaluating the school's residents is certainly an important policy of the department, the provisions of P.A. 99-26, standing alone, do not make it an "explicit public policy that is well defined and dominant . . . ." (Internal quotation marks omitted.) *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 46.

[20] In support of this broad public policy claim, the plaintiff quotes numerous passages from *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000). For example, one passage states: "That the protection and nurturing of children is an important public policy is almost too obvious for discussion. General Statutes § 17a-101 (a) provides without equivocation: 'The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect [and] . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . . .' This policy has been extensively cited in our case law." Id., 798–99. That passage, as well as others cited by the plaintiff, demonstrates that the plaintiff, acting through the department, has a broad public policy regarding the protection of the children of our state.

[21] We reemphasize, however, "that a party raising such a challenge to an arbitral award may not succeed in receiving de novo review merely by labeling its challenge as falling within the public policy exception to the normal rule of deference. The substance, not the form, of the challenge will govern. Thus, the court should not afford de novo review of the award without first determining that the challenge truly raises a legitimate and colorable claim of violation of public policy. If it does raise such a claim, de novo review should be afforded. If it does not, however, the normal deferential scope of review should apply." *Schoonmaker* v. *Cummings &*

that the plaintiff has not met its burden of demonstrating that the arbitrator's award clearly violated this public policy. The issue facing the arbitrator was whether the schedule implemented by the plaintiff violated article two and/or article thirteen, § 6, of the agreement between the parties. The arbitrator answered this question in the affirmative, and concluded that the schedule "implemented at the time and in the manner it was, [did] not strike a reasonable balance of the needs of the clients, the [department] and the staff, even giving greater weight to the clients and the [department's] needs." Contrary to the claims of the plaintiff, this award does not deprive the department of the ability to implement a second shift for the clinical staff.[22] Instead, the award was limited to determining the precise question of whether the *specific* second shift schedule implemented by the department violated the terms of the agreement.[23] The award does not infringe on the

*Lockwood of Connecticut, P.C.*, supra, 252 Conn. 429 n.7; see *State v. AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 797 ("the question of whether a public policy issue is in fact implicated should not be brushed aside").

[22] The plaintiff asserts that "[t]he . . . [a]ward, in depriving the [d]epartment of *its right* to implement a mandatory second shift at [the school] in order to administer the clinical needs of troubled youth, is so egregious as to violate public policy." (Emphasis added.) This assertion is without merit. While the department may have a right to implement a new schedule, pursuant to article thirteen, § 6, of the agreement, the defendant "shall have the right to request arbitration following the schedule change implementations." Thus, both parties properly exercised their rights under the agreement.

[23] In her decision, the arbitrator emphasized the limited scope of her award: "[T]he [defendant] has met its burden of proving that this particular shift, *implemented at the time and in the manner it was*, does not strike a reasonable balance of the needs of the clients, the [department] and the staff, even giving greater weight to the clients and the [department's] needs. Rather, I find that the [department] had alternatives that would have met its client and [departmental] needs with a less severe impact on the lives of the employees." (Emphasis added.)

It should also be noted that the arbitrator stayed her award for one month to give the parties an opportunity to reach an agreement on a new schedule or complete new negotiations. Only after the expiration of that time frame would the new, second shift, schedule be eliminated and the old, one shift, schedule be reinstated.

plaintiff's overall management of the school, nor does it depart from the essence of the agreement between the parties. That agreement provides for the arbitration of scheduling disputes. Implicit in this agreement is an understanding that an arbitrator may find that a scheduling change made by the plaintiff violated the terms of the agreement. Accordingly, we reject the plaintiff's claim that the arbitrator's award in this scheduling dispute violated the broad public policy objectives of the department. Cf. *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 478 (arbitration award violated clearly defined public policy because award reinstated to department employee whose conduct "blatantly violated" both criminal statute and at least ten department employment regulations).

Furthermore, acceptance of the plaintiff's public policy claim would be tantamount to holding that any time the department made a scheduling change that an arbitrator subsequently found to be in violation of the agreement, the arbitrator's award would be subject to a successful public policy challenge. It would be illogical to expect unions to enter into collective bargaining agreements with the state while fearing that any subsequent arbitration award in their favor would be in violation of public policy. Furthermore, this would conflict with our state's public policy favoring the ability of employees to bargain collectively for the terms of their employment; see General Statutes § 31-104 (right to bargain collectively); General Statutes § 31-105 (defining unfair labor practices); and public policy favoring arbitration as a means of dispute resolution. See *Local 63, Textile Workers Union* v. *Cheney Bros.*, 141 Conn. 606, 612–13, 109 A.2d 240 (1954) (arbitration "commands much favor from the law . . . as a means of promoting tranquility and the prompt and equitable settlement of disputes in the field of labor relations" [cita-

tions omitted]), cert. denied, 348 U.S. 959, 75 S. Ct. 449, 99 L. Ed. 748 (1955).

B

The plaintiff next claims that the arbitrator exceeded her powers by extending the award to employees who had left their employment at the school because of the new schedule. The defendant disagrees with the plaintiff's claim, and asserts that the submission was unrestricted in this case, and therefore the arbitrator was empowered to decide the remedy without restriction. Again, we agree with the defendant.

Despite the general rule that challenges to an arbitrator's award are limited to a comparison of the award to the submission; *State* v. *AFSCME, Council 4, Local 387, AFL-CIO,* supra, 252 Conn. 474; an additional statutory challenge exists "if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." General Statutes § 52-418 (a) (4). The question of whether an arbitrator exceeded her authority under § 52-418 (a) requires, in effect, de novo judicial review. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.,* supra, 252 Conn. 431.

When addressing a challenge of this type, "we have, as a general matter, looked to a comparison of the award with the submission to determine whether the arbitrators have exceeded their powers. *New Haven* v. *AFSCME, Council 15, Local 530,* [208 Conn. 411, 415, 544 A.2d 186 (1988)]; *O & G/O'Connell Joint Venture* v. *Chase Family Limited Partnership No. 3,* 203 Conn. 133, 153, 523 A.2d 1271 (1987); *Bic Pen Corporation* v. *Local No. 134,* [183 Conn. 579, 584, 440 A.2d 774 (1981)]." *Garrity* v. *McCaskey,* supra, 223 Conn. 7. The party challenging the award bears the burden of producing evidence sufficient to demonstrate that the arbitrator exceeded her powers. *Industrial Risk Insurers* v.

*Hartford Steam Boiler Inspection & Ins. Co.*, 258 Conn. 101, 115, 779 A.2d 737 (2001).

The plaintiff, in claiming that the arbitrator exceeded her power, asserts that "[a]n arbitrator who rules on a work schedule grievance submission is empowered to do one of two things. She may deny the grievance and the work schedule remains in place. Or, conversely, she may sustain the grievance and the parties are left to attempt to negotiate shift coverage. The arbitrator may not, as here, order reinstatement of former employees who voluntarily left the [school]."

The plain language of the submission, however, does not support the plaintiff's limited interpretation of the arbitrator's powers. The unrestricted submission in this case required the arbitrator to determine if the new second shift violated the agreement between the parties, "and, if so, what shall be the remedy, consistent with the agreement." The submission contained no language limiting the arbitrator's powers to the two options outlined by the plaintiff. After concluding that the new schedule did violate the agreement, the arbitrator ordered that "employees who have left *because of the schedule at issue here* [be] given an opportunity to return to their previous positions, if available, if no other reason precluding reinstatement exists." (Emphasis added.) The broad language of the submission supports the arbitrator's decision that employees who left their employment due to the implementation of a new schedule, which was later found to be in violation of the agreement, should be given an opportunity to return to their jobs.

In addition, as long as the arbitrator's remedies were "consistent with the agreement," they were within the scope of the submission. The plaintiff has failed to demonstrate that the award issued in the present case was not consistent with the agreement. Accordingly, we con-

clude that the plaintiff has not met its burden in demonstrating that the arbitrator exceeded her powers. See *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, supra, 258 Conn. 117 (finding that "plain language of the submission" did not support plaintiff's claim that arbitrator exceeded authority).

The judgment of the trial court is reversed and the case is remanded to that court with direction to confirm the arbitrator's award.

In this opinion the other justices concurred.