# BOARD OF EDUCATION OF THE TOWN OF PRESTON
## *v.* CIVIL SERVICE EMPLOYEES AFFILIATES, LOCAL 760
### (AC 24849)

Foti, Bishop and DiPentima, Js.

Argued January 13—officially released April 19, 2005

*Robert J. Krzys*, for the appellant (defendant).

*Shawn P. Coyne*, for the appellee (plaintiff).

*Opinion*

BISHOP, J. This is an appeal from the judgment of the trial court vacating an arbitration award issued in connection with a grievance by a school bus driver. On appeal, the defendant, the Civil Service Employees Affiliates, Local 760 (Local 760), claims that in vacating the arbitration award, the court (1) incorrectly conducted a de novo review of the underlying facts, (2) incorrectly determined that the panel had misconstrued applicable provisions of the parties' collective bargaining agreement, (3) misapplied the law and (4) incorrectly determined that the arbitration panel had exceeded its authority in making its award. We reverse the judgment of the trial court.

The record discloses the following procedural history and facts relevant to our discussion of the issues on appeal. The parties to this appeal are the board of education of the town of Preston (board) and Local 760, the union that represents mechanics and bus drivers employed by the board. In June, 1998, the parties executed a collective bargaining agreement (agreement) covering the time period of July 1, 1997, through June 30, 2000, which generally sets forth the terms and conditions of employment for mechanics and bus drivers employed by the board. The agreement contains thirty-six articles, including a provision for a multistep grievance procedure for any claimed violation of the terms of the agreement, leading to binding arbitration as the last step. The arbitration provision contains the following statement: "10.5.5 The arbitrator shall hear and decide one grievance in each case. Each grievance is

limited to one issue or multiple issues if they are related and involve essentially the same facts. He/she shall be bound by and must comply with all of the terms of this Agreement. He/she shall not have power to add to, delete from, or modify in any way any of the provisions of this Agreement."

The agreement contains a schedule that recites the hourly compensation rates for mechanics and bus drivers for each of the contract years on the basis of years of service. Although the agreement also states the number of hours employees must work to be considered full-time or part-time employees and indicates that the normal workday for mechanics consists of eight hours, the number of paid hours per day for bus drivers is determined by the character of the drivers' runs. Specifically, § 17.4 of the agreement provides in relevant part: "The following are the hours per day for drivers based on the academic year calendar:

"Morning

"a) High school and K-8 runs—three (3) hours per day.

"b) K-8 runs only—two (2) hours per day.

"c) High School only—one (1) and one-half (1/2) hours per day.

"Noon

"(a) Kindergarten run—Two (2) hours per day.

"Afternoon

"(a) High school and K-8 runs—three (3) hours per day.

"(b) K-8 runs only—two hours per day.

"(c) High School only—one (1) and one-half (1/2) hours per day."

Thus, unlike the situation with mechanics, the agreement does not provide for bus drivers to work a specified number of hours per day. Rather, the agreement pairs runs with hours, the result being that an employee who drives a bus on one type of run is credited with having worked a predetermined number of hours regardless of whether the particular run actually takes more or less than the time credited. For example, an employee who is assigned to drive high school students in the morning is credited with having worked one and one-half hours, while another employee who is assigned both high school and elementary school runs in the morning is credited with three hours of employment irrespective of the time actually required to drive the assigned runs. Elsewhere, § 4 of the agreement provides that the board has the right to determine bus routes, to assign employees work or routes and to determine shifts, work schedules and hours of work.

The board's authority to assign employees to specific routes must be read in the context of § 17 of the agreement, which provides in pertinent part: "Section 17.9 All extra runs and field trips will be assigned according to seniority on a rotating basis. If a driver loses a run through mechanical failure or some other reason through no fault of his/her own other than a reduction in the number of runs, the driver will be reassigned to do other work if available and paid his/her normal hourly rate of pay for the duration of the canceled or lost run(s).

"Section 17.10 All new daily runs and all field trips (which include but [are] not limited to sport trips) will be posted at the beginning of each month if possible. All new daily runs and all field trips will be otherwise posted with as much notice as possible but no less than five days unless there is an emergency.

"Section 17.11 When possible, bus drivers may remain in the assigned bus route from the previous year. How-

ever, if a bus driver wants to transfer to another route, he/she will select from the remaining available bus routes and be assigned according to seniority. At least one week prior to the beginning of the school year, regular runs will be posted and then assigned in accordance with the above procedure. Bus routes may be adjusted to accommodate the needs of the school district." Consequently, although the board had the sole authority to determine bus routes, the parties' agreement includes provisions for the posting of routes and for bus drivers to bid on routes, including new routes, by seniority.

After the agreement was signed, the board became required, for the first time, to provide transportation services to prekindergarten children living in the school district. Initially, that requirement was limited to the busing of children to attend a morning program outside the district at St. Bernard's school in Uncasville. The board was required to arrange for the pickup of children at their homes in the morning, the delivery of those children to St. Bernard's school and the noontime return of the children from St. Bernard's school to their homes. Determining that this new requirement could not be accomplished within the existing bus route matrix, Charles Raymond, the transportation supervisor for the board, posted the morning and noon runs for the prekindergarten children as new daily runs pursuant to § 17.10 of the contract.

Subsequently, in January, 1999, the board undertook an additional obligation to transport prekindergarten children to St. Bernard's school for an afternoon session, requiring that the children be picked up at their homes at noontime and returned home at the end of their afternoon session. In that instance, Raymond decided that the new afternoon responsibility could be satisfied by adjusting stops on existing afternoon routes without the necessity of creating a new route. He deter-

mined that a driver could be sent to pick up the children at St. Bernard's and bring them to a transfer point where they would board different buses taking them to their homes. Through that arrangement, Raymond determined that the board could satisfy its obligation to transport prekindergarten children to and from their afternoon session within the framework of existing routes without incurring any additional costs to the board.

To effectuate his plan, Raymond decided to reroute bus number twelve, operated by Patti Daniels, to pick up the afternoon prekindergarten children at St. Bernard's. When assigning that additional stop to Daniels, Raymond eliminated one stop from her preexisting route. When informed of the plan, Daniels balked on the basis of her belief that she should receive extra compensation for a new route. In response, Raymond took the position that his plan did not entail a new route, but rather, constituted a revision to an existing route and that § 17.11 of the agreement entitled the board to make adjustments to bus routes to accommodate the needs of the school district. Although Daniels agreed to perform the newly assigned task, she filed a grievance, claiming that she had been assigned a new route without additional compensation and in violation of the posting terms of the agreement. After going through the internal steps of the grievance process, the parties agreed to submit their dispute to binding arbitration. The submission to the arbitration panel was as follows: "1. Did the Preston Board of Education violate the Collective Bargaining Agreement between the parties when it changed the grievant's bus route? 2. If so, what shall the remedy be?"

After a hearing on the grievance, the three member panel issued its award in which it determined that Daniels had been assigned a new route. Consequently, the panel determined that by the terms of the agreement,

the route should have been posted as new and that Daniels had a contractual right either to select that route or to bid for another.[1] Thus, the panel found in favor of the grievant. As a remedy for the board's breach of the agreement, the panel ordered that "[t]he grievant shall be paid for one hour for each day she was compelled to complete an involuntary run."

Following receipt of the arbitrators' award, the board, on March 29, 2000, filed an application to vacate the award, alleging that the award violated (1) General Statutes § 52-418 (a) (4)[2] because the arbitrators "exceeded their powers in making the decision and award or so imperfectly executed them that a mutual, final and indefinite award upon the subject matter was not made by, among other things, misconstruing and misinterpreting the [a]greement," (2) General Statutes § 52-419 (a) (1)[3] in that "there has been an evident material miscalculation of figures," (3) General Statutes § 52-419 (a) (3) in that "the award is imperfect in matter of form not affecting the merits of the controversy" and (4) the public policy of the state.

The court granted the board's application to vacate on November 3, 2003. The court found that in deciding

[1] Daniels had substantial seniority as a bus driver.

[2] General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides . . . shall make an order vacating the award if it finds any of the following defects . . . (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[3] General Statutes § 52-419 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides . . . shall make an order modifying or correcting the award if it finds any of the following defects: (1) If there has been an evident material miscalculation of figures or an evident material mistake in the description of any person, thing or property referred to in the award; (2) if the arbitrators have awarded upon a matter not submitted to them unless it is a matter not affecting the merits of the decision upon the matters submitted; or (3) if the award is imperfect in matter of form not affecting the merits of the controversy."

that the board had created a new route rather than an adjustment to an existing run, the arbitrators had ignored § 4 of the agreement concerning management rights as well as the provisions of the agreement giving the board broad discretion in adjusting routes to accommodate the needs of the school district. In its memorandum of decision, the court stated that "[i]n failing to accept the board's position that the change in one stop did not constitute a new route, the panel ignored § 4.1 and these other relevant provisions of the agreement." The court also disagreed with the arbitrators' conclusion that the grievant had a contractual right to choose or to refuse the route in question. Finally, the court determined that "[b]y disregarding the clear and specific terms of the agreement and issuing an award that essentially adds new terms in contravention of § 10.5.5, the panel here exceeded its authority." This appeal followed.

At the outset, we note our standard of review regarding arbitration and general principles of law concerning such matters. "The well established general rule is that [w]hen the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law as long as the award conforms to the submission. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . Furthermore, in applying this general rule of deference to an arbitrator's award, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the arbitrators' acts and

proceedings." (Citations omitted; internal quotation marks omitted.) *State* v. *New England Health Care Employees Union*, 271 Conn. 127, 134, 855 A.2d 964 (2004). Further, "[j]udicial review of arbitral decisions is narrowly confined." *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, 248 Conn. 108, 114, 728 A.2d 1063 (1999). " 'Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved.' . . . *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 340–41, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985); see *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, [supra, 116] ('it is the arbitrator's judgment that was bargained for and contracted for by the parties, and we do not substitute our own judgment merely because our interpretation of the agreement or contract at issue might differ from that of the arbitrator')." *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 265 Conn. 771, 778, 830 A.2d 729 (2003).

Our deference to arbitral awards is, however, not unlimited. General Statutes § 52-418 (4) provides in relevant part that an arbitration award may be vacated "if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." It is the first part of that statutory subdivision that is implicated in this appeal. In determining whether an arbitration panel has exceeded its powers, a reviewing court need only examine the submission and the award to determine whether the award conforms to the submission. *Bridgeport* v. *Bridgeport Police Local*

*1159*, 183 Conn. 102, 106, 438 A.2d 1171 (1981); see also *Trumbull* v. *Trumbull Police Local 1745*, 1 Conn. App. 207, 212, 470 A.2d 1219 (1984). Additionally, an arbitration award that manifests an egregious or patently irrational application of the law should be set aside because by ignoring or patently disregarding established law, an arbitrator is held to have exceeded his or her authority. *Preston* v. *State Division of Criminal Justice*, 60 Conn. App. 853, 862, 761 A.2d 778 (2000), cert. denied, 255 Conn. 936, 767 A.2d 1212 (2001).

Finally, we note that we accord the greatest deference to awards that have been made pursuant to unrestricted submissions. "A submission to arbitration is unrestricted if there is no express language restricting the breadth of issues, reserving explicit rights or conditioning the award on court review." *Wachter* v. *UDV North America, Inc.*, 75 Conn. App. 538, 545 n.9, 816 A.2d 668 (2003). The submission in this instance contained no such limitations or conditions and was, therefore, unrestricted. The general principles previously set forth suggest that an award based on an unrestricted submission may be vacated only if the award is beyond the submission or if, in fashioning its award, the arbitration panel egregiously has disregarded established law.

In its decision vacating the award, the court determined that the route the grievant was required to travel in the afternoon was not a new route, but rather an allowable modification of an existing route. In reaching that decision, the court interpreted the agreement differently from the panel. In reaching that different interpretation, however, the court failed to accord sufficient deference to the contrary determination of the panel. Although we agree that the interpretation of a contract is normally a question of law subject to de novo review, in the arbitration context, a court's review of an arbitrator's legal determination is more limited and deferential. When the scope of the submission is unrestricted, "the

arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous." (Internal quotation marks omitted.) *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO,* supra, 265 Conn. 778. Indeed, in order to set aside an award on the ground that it represents a misapplication of the law or facts, a reviewing court must find that the award manifests an egregious or patently irrational application of the law, and such a finding should be made only on the conclusion that the arbitrators' award reflects an "extraordinary lack of fidelity to established legal principles." *Garrity* v. *McCaskey,* 223 Conn. 1, 10, 612 A.2d 742 (1992).

By substituting its interpretation of the language of the agreement to determine that the new assignment was only an alteration of an existing route and not a new route, the court improperly substituted its interpretative judgment for that of the panel. Moreover, the panel's conclusion does not reflect a manifest disregard for the law. A fair reading of the agreement leads us to the belief that the panel reasonably could have determined that by requiring the grievant to travel to another town to retrieve prekindergarten students, the board established a new route. In reaching that conclusion, the panel did not ignore clear contrary language of the agreement.

The court additionally found that the panel exceeded its authority in fashioning its remedy because that particular remedy was not provided for in the agreement. As a starting point, we note that § 10.5.5 of the agreement provides in relevant part that an arbitrator "shall be bound by and must comply with all of the terms of this Agreement. He/she shall not have power to add to, delete from, or modify in any way any of the provisions of this Agreement." Although we are in

accord with the court that the panel was not authorized to fashion a remedy that would constitute a modification of the agreement, we do not concur with the court's conclusion that the remedy had the effect of modifying the terms of the agreement.

To address that claim, we first discuss the concept of a remedy in the arbitration context. As a general proposition, when the disputants ask an arbitrator to determine whether a contract violation occurred and, if so, to fashion a remedy, the arbitrator is authorized from that unrestricted submission to fashion any remedy that is "rationally related to a plausible interpretation of the agreement . . . ." *Advanced Micro Devices, Inc.* v. *Intel Corp.*, 9 Cal. 4th 362, 382, 885 P.2d 994, 36 Cal. Rptr. 2d 581 (1994). Put another way, when the submission is unrestricted, the remedy determined by an arbitrator will be upheld as long as the remedy "draws its essence from the collective bargaining agreement . . . ." *United Steelworkers of America* v. *Enterprise Car & Wheel Corp.*, 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960); see also F. Elkouri & E. Elkouri, How Arbitration Works (6th Ed. 2003) c. 18, pp. 1188–1241. In deciding that the panel had exceeded its authority in this instance, the court stated that the panel essentially disregarded § 17.4 of the agreement and established its own basis of compensation for a run, "thereby adding new terms to the agreement in violation of § 10.5.5." We disagree.

Section 17.4 of the agreement does not set forth the compensation for a driver who, in the afternoon, is required to transport prekindergarten children. As noted, § 17.4 provides the following for afternoon runs: "a) High school and K-8 runs—three (3) hours per day. . . . b) K-8 runs only—two (2) hours per day [and] c) High School only—one (1) and one-half hours (½) per day." In the absence of express language in the agreement establishing the compensation for a driver

required to drive a run involving prekindergarten children, the arbitration panel would have been incapable of fashioning an appropriate remedy unless it was authorized by the submission to devise a remedy that drew its rationale from the agreement. Because it is clear from a reading of § 17.4 of the agreement that the grade level of students and not the amount of time required of a run or a combination of runs in the afternoon was the determining factor in establishing compensation, a remedy that ties the newly assigned prekindergarten run to a specific amount of time is consistent with the agreement's compensation scheme. Thus, we believe that the remedy awarded by the panel both drew its essence from the agreement and was consonant with its terms. Moreover, the award does not purport to establish, generally, the compensation value of the newly assigned run.[4] Rather, we view the remedy as an award of damages to this particular grievant for the specific time period involved. Given the unrestricted scope of the submission, the panel was entitled to fashion a nonpunitive compensatory damages award. See *Hartford* v. *International Assn. of Firefighters, Local 760,* 49 Conn. App. 805, 814, 717 A.2d 258, cert. denied, 247 Conn. 920, 722 A.2d 809 (1998).

We conclude that the court should not have vacated the arbitration award because it improperly substituted its legal judgments and conclusions for those of the panel and incorrectly concluded that the panel exceeded its authority in formulating its award and remedy.

The judgment is reversed and the case is remanded with direction to render judgment denying the board's application to vacate the arbitration award.

In this opinion the other judges concurred.

[4] We note, specifically, that the panel did not establish the pay schedule for any driver who may be assigned to transport prekindergarten children in the afternoon. Rather, the panel awarded compensatory damages to this

particular grievant only for the time period in which she involuntarily drove the run.